RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0117p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ANTHONY DAUNT, TOM BARRETT, AARON BEAUCHINE, KATHY BERDEN, STEPHEN DAUNT, GERRY HILDENBRAND, GARY KOUTSOUBOS, LINDA LEE TARVER, PATRICK MEYERS, MARIAN SHERIDAN, MARY SHINKLE, NORM SHINKLE, PAUL SHERIDAN, BRIDGET BEARD, and CLINT TARVER (19-2377); MICHIGAN REPUBLICAN PARTY, LAURA COX, TERRI LYNN LAND, SAVINA ALEXANDRA ZOE MUCCI, DORIAN THOMPSON, and HANK VAUPEL (19-2420),

　　　　　　　　　　　　　*Plaintiffs-Appellants*,

　　*v.*

JOCELYN BENSON, in her official capacity as Michigan Secretary of State; COUNT MI VOTE, doing business as Voters Not Politicians,

　　　　　　　　　　　　　*Defendants-Appellees*.

> Nos. 19-2377/2420

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
Nos. 1:19-cv-00614 (19-2377); 1:19-cv-00669 (19-2420)—Janet T. Neff, District Judge.

Argued:  March 17, 2020

Decided and Filed:  April 15, 2020

Before:  MOORE, GILMAN, and READLER, Circuit Judges.

---

## COUNSEL

**ARGUED:**  John J. Bursch, BURSCH LAW, Caledonia, Michigan, for Appellants in 19-2377. Gary P. Gordon, DYKEMA GOSSETT PLLC, Lansing, Michigan, for Appellants in 19-2420. Heather S. Meingast, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee Benson.  Paul M. Smith, CAMPAIGN LEGAL CENTER, Washington, D.C., for Appellee Count MI Vote.  **ON BRIEF:**  John J. Bursch, BURSCH LAW, Caledonia,

Michigan, Jason Torchinsky, HOLTZMAN VOGEL JOSEFIAK TORCHINSKY PLLC, Warrenton, Virginia, for Appellants in 19-2377.  Gary P. Gordon, Jason T. Hanselman, Scott A. Hughes, DYKEMA GOSSETT PLLC, Lansing, Michigan, Charles R. Spies, Robert L. Avers, DICKINSON WRIGHT PLLC, Lansing, Michigan, for Appellants in 19-2420.  Heather S. Meingast, Erik A. Grill, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee Benson.  Paul M. Smith, Mark P. Gaber, CAMPAIGN LEGAL CENTER, Washington, D.C., Graham K. Crabtree, FRASER TREBILCOCK DAVIS & DUNLAP, P.C., Lansing, Michigan, Annabelle E. Harless, CAMPAIGN LEGAL CENTER, Chicago, Illinois, for Appellee Count MI Vote.  Mark Brewer, GOODMAN ACKER, P.C., Southfield, Michigan, Zachary D. Tripp, WEIL, GOTSHAL & MANGES LLP, Washington, D.C., Michael B. Kimberly, MCDERMOTT WILL & EMERY, Washington, D.C., for Amici Curiae.

MOORE, J., delivered the opinion of the court in which GILMAN, J., joined. READLER, J. (pp. 32–44), delivered a separate opinion concurring in the judgment.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.  These two appeals arise from challenges filed by individual plaintiffs and the Michigan Republican Party to Michigan's new Independent Citizens Redistricting Commission.  The Commission was established by ballot initiative in the 2018 Michigan general election.  The first lawsuit was filed by Michigan citizens who allege that they are unconstitutionally excluded from serving on the Commission due to its eligibility criteria, which prohibit eight classes of individuals with certain current or past political ties from serving as a commissioner.  The second lawsuit was filed by the Michigan Republican Party and individual plaintiffs, making the same allegation as the first lawsuit and raising other First Amendment allegations regarding the Commission's selection process, its composition, and its restrictions on the commissioners' ability to speak publicly about redistricting matters.

The plaintiffs in both cases moved for preliminary injunctions against the implementation of the Commission.  The district court denied these motions, and the plaintiffs have appealed. For the reasons stated below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

**A.  Establishment of the Commission**

On November 6, 2018, Michigan voters voted in favor of Proposal 18-2 on the general election ballot.  MICH. CONST., art. IV, § 6.  Proposal 18-2 stated the following:

**Proposal 18-2**

**A proposed constitutional amendment to establish a commission of citizens with exclusive authority to adopt district boundaries for the Michigan Senate, Michigan House of Representatives and U.S. Congress, every 10 years.**

This proposed constitutional amendment would:

- Create a commission of 13 registered voters randomly selected by the Secretary of State:

    - 4 each who self-identify as affiliated with the 2 major political parties; and

    - 5 who self-identify as unaffiliated with major political parties.

- Prohibit partisan officeholders and candidates, their employees, certain relatives, and lobbyists from serving as commissioners.

- Establish new redistricting criteria including geographically compact and contiguous districts of equal population, reflecting Michigan's diverse population and communities of interest.  Districts shall not provide disproportionate advantage to political parties or candidates.

- Require an appropriation of funds for commission operations and commissioner compensation.

Should this proposal be adopted?

[ ]     YES

[ ]     NO

Michigan Board of State Canvassers, *Official Ballot Wording approved by the Board of State Canvassers, August 30, 2018, Voters Not Politicians*, https://www.michigan.gov/documents/sos/Official_Ballot_Wording_Prop_18-2_632052_7.pdf.    This constitutional amendment (the "Amendment") took effect on December 22, 2018.  MICH. CONST., art. IV, § 6.

## B. Structure of the Commission

Article IV, § 6 of the amended Michigan Constitution sets forth the eligibility criteria for membership on the newly created "independent citizens redistricting commission" (the "Commission"), as follows:

(1) An independent citizens redistricting commission for state legislative and congressional districts (hereinafter, the "commission") is hereby established as a permanent commission in the legislative branch. The commission shall consist of 13 commissioners. The commission shall adopt a redistricting plan for each of the following types of districts: state senate districts, state house of representative districts, and congressional districts. Each commissioner shall:

(a) Be registered and eligible to vote in the state of Michigan;

(b) Not currently be or in the past 6 years have been any of the following:

(i) A declared candidate for partisan federal, state, or local office;

(ii) An elected official to partisan federal, state, or local office;

(iii) An officer or member of the governing body of a national, state, or local political party;

(iv) A paid consultant or employee of a federal, state, or local elected official or political candidate, of a federal, state, or local political candidate's campaign, or of a political action committee;

(v) An employee of the legislature;

(vi) Any person who is registered as a lobbyist agent with the Michigan bureau of elections, or any employee of such person; or

(vii) An unclassified state employee who is exempt from classification in state civil service pursuant to article XI, section 5, except for employees of courts of record, employees of the state institutions of higher education, and persons in the armed forces of the state;

(c) Not be a parent, stepparent, child, stepchild, or spouse of any individual disqualified under part (1)(b) of this section; or

(d) Not be otherwise disqualified for appointed or elected office by this constitution.

(e) For five years after the date of appointment, a commissioner is ineligible to hold a partisan elective office at the state, county, city, village, or township level in Michigan.

*Id.*

Section 2 of article IV sets forth the process by which the Secretary of State selects commissioners, as follows:

(a)   The secretary of state shall do all of the following:

 (i)   Make applications for commissioner available to the general public not later than January 1 of the year of the federal decennial census.  The secretary of state shall circulate the applications in a manner that invites wide public participation from different regions of the state.  The secretary of state shall also mail applications for commissioner to ten thousand Michigan registered voters, selected at random, by January 1 of the year of the federal decennial census.

 (ii)   Require applicants to provide a completed application.

 (iii)   Require applicants to attest under oath that they meet the qualifications set forth in this section; and either that they affiliate with one of the two political parties with the largest representation in the legislature (hereinafter, "major parties"), and if so, identify the party with which they affiliate, or that they do not affiliate with either of the major parties.

(b)   Subject to part (2)(c) of this section, the secretary of state shall mail additional applications for commissioner to Michigan registered voters selected at random until 30 qualifying applicants that affiliate with one of the two major parties have submitted applications, 30 qualifying applicants that identify that they affiliate with the other of the two major parties have submitted applications, and 40 qualifying applicants that identify that they do not affiliate with either of the two major parties have submitted applications, each in response to the mailings.

(c)   The secretary of state shall accept applications for commissioner until June 1 of the year of the federal decennial census.

(d)   By July 1 of the year of the federal decennial census, from all of the applications submitted, the secretary of state shall:

 (i)   Eliminate incomplete applications and applications of applicants who do not meet the qualifications in parts (1)(a) through (1)(d) of this section based solely on the information contained in the applications;

 (ii)   Randomly select 60 applicants from each pool of affiliating applicants and 80 applicants from the pool of non-affiliating applicants.  50% of each pool shall be populated from the qualifying applicants to such pool who returned an application mailed pursuant to part 2(a) or 2(b) of this section, provided, that if fewer than 30 qualifying applicants affiliated with a major party or fewer than 40 qualifying non-affiliating applicants have applied to serve on the commission in response to the random mailing, the balance of the pool shall be populated from the balance of qualifying applicants to that pool.  The random selection process used by

the secretary of state to fill the selection pools shall use accepted statistical weighting methods to ensure that the pools, as closely as possible, mirror the geographic and demographic makeup of the state; and

(iii)  Submit the randomly-selected applications to the majority leader and the minority leader of the senate, and the speaker of the house of representatives and the minority leader of the house of representatives.

(e)  By August 1 of the year of the federal decennial census, the majority leader of the senate, the minority leader of the senate, the speaker of the house of representatives, and the minority leader of the house of representatives may each strike five applicants from any pool or pools, up to a maximum of 20 total strikes by the four legislative leaders.

(f)  By September 1 of the year of the federal decennial census, the secretary of state shall randomly draw the names of four commissioners from each of the two pools of remaining applicants affiliating with a major party, and five commissioners from the pool of remaining non-affiliating applicants.

*Id.* Commissioners hold office until the Commission has completed its obligations for the census cycle. *Id.* § 18. They receive compensation equal to at least 25 percent of the governor's salary, and the State reimburses them for costs incurred if the legislature does not appropriate sufficient funds to cover these costs. *Id.* § 5.

With respect to the Commission's operations, "[a] final decision of the commission to adopt a redistricting plan requires a majority vote of the commission, including at least two commissioners who affiliate with each major party, and at least two commissioners who do not affiliate with either major party." *Id.* § 14(c). Commissioners are required to "abide by the following criteria in proposing and adopting" these plans:

(a)  Districts shall be of equal population as mandated by the United States constitution, and shall comply with the voting rights act and other federal laws.

(b)  Districts shall be geographically contiguous. Island areas are considered to be contiguous by land to the county of which they are a part.

(c)  Districts shall reflect the state's diverse population and communities of interest. Communities of interest may include, but shall not be limited to, populations that share cultural or historical characteristics or economic interests. Communities of interest do not include relationships with political parties, incumbents, or political candidates.

(d)  Districts shall not provide a disproportionate advantage to any political party. A disproportionate advantage to a political party shall be determined using accepted measures of partisan fairness.

(e)  Districts shall not favor or disfavor an incumbent elected official or a candidate.

(f)  Districts shall reflect consideration of county, city, and township boundaries.

(g)  Districts shall be reasonably compact.

*Id.* § 13.

The Amendment includes the following provision regulating the commissioners' ability to speak publicly about their duties:

> The commission, its members, staff, attorneys, and consultants shall not discuss redistricting matters with members of the public outside of an open meeting of the commission, except that a commissioner may communicate about redistricting matters with members of the public to gain information relevant to the performance of his or her duties if such communication occurs (a) in writing or (b) at a previously publicly noticed forum or town hall open to the general public.

*Id.* § 11.

## C. Procedural Posture

Anthony Daunt, along with numerous other individual plaintiffs, filed a complaint and motion for preliminary injunction against Secretary Benson on July 30, 2019, alleging that the Commission's eligibility criteria violated the First and Fourteenth Amendments. *Daunt*, R. 1 (Compl. ¶ 2) (Page ID #3); *Daunt*, R. 4 (Mot. for Prelim. Inj.) (Page ID #53).[1] These plaintiffs ("Daunt") alleged that they "each desire[d] to serve on the Commission but are excluded from consideration" due to the eligibility criteria. *Daunt*, R. 1 (Compl. ¶ 39) (Page ID #17).[2] The district court thereafter granted a motion to intervene as defendant filed by Count MI Vote d/b/a

---

[1]Because we consider two appeals, and thus two sets of district-court documents, all record cites identify the specific case in which the given record was filed. For purposes of clarity, rather than prefacing all record cites by case number, we preface all record cites by the lead plaintiff's name in the relevant case. For example, rather than "No. 19-2377, R. 1," we use "*Daunt*, R. 1."

[2]The district court's opinion sets forth in detail the various bases upon which the plaintiffs-appellants are excluded from serving on the Commission. *Daunt v. Benson*, No. 1:19-CV-614, 2019 WL 6271435, at *6–7 (W.D. Mich. Nov. 25, 2019).

Voters Not Politicians ("VNP"), the ballot-proposal committee that filed Proposal 18-2. *Daunt*, R. 23 (Op. & Order at 1) (Page ID #262).

Three weeks after the *Daunt* case commenced, the Michigan Republican Party ("MRP"), along with numerous individual plaintiffs, filed a complaint and motion for preliminary injunction against Secretary Benson on August 22, 2019. MRP similarly alleged that the eligibility criteria of the Amendment violated the First and Fourteenth Amendments, and additionally alleged that the Amendment's provision allowing applicants to self-identify as Republicans violated MRP's freedom of association, that the Commission's composition was viewpoint-discriminatory, and that the speech provision violated the First Amendment. *MRP*, R. 1 (Compl. ¶¶ 65–129) (Page ID #15–24); *MRP*, R. 2 (Mot. for Prelim. Inj. at 2) (Page ID #36). The district court thereafter granted VNP's motion to intervene as defendant. *MRP*, R. 15 (Order at 1) (Page ID #171).

On September 11, 2019, the district court consolidated *Daunt* with *MRP*. *Daunt*, R. 30 (Order at 2) (Page ID #334). On November 25, 2019, the district court denied both motions for a preliminary injunction. *Daunt v. Benson*, No. 1:19-CV-614, 2019 WL 6271435 (W.D. Mich. Nov. 25, 2019). Daunt and MRP timely filed notices of appeal pursuant to 28 U.S.C. § 1292(a)(1). *Daunt*, R. 69 (Notice of Interlocutory Appeal) (Page ID #974); *MRP*, R. 65 (Notice of Interlocutory Appeal) (Page ID #877).

## II.  DISCUSSION

### A.  Standard of Review

In deciding whether to grant a preliminary injunction, a court weighs four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012). "A district court's decision regarding whether to grant a preliminary injunction—and its weighing of the four factors—is normally reviewed for an abuse of discretion." *Id.* at 819. "In First Amendment cases, however, 'the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood

of success on the merits. This is so because . . . the issues of the public interest and harm to the respective parties largely depend on the constitutionality of the [state action].'" *Id.* (quoting *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007)). We review for abuse of discretion, subjecting factual findings to clear-error review and examining legal conclusions de novo. *See Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 412 (6th Cir. 2014).

## B. The Eligibility Criteria

Both Daunt and MRP challenge the constitutionality of the Amendment's eligibility criteria as violative of the First and Fourteenth Amendments. Both the question of the criteria's constitutionality and the analytical framework through which to answer this question are matters of first impression not only in this circuit but in the federal courts generally. For the reasons explained below, we believe that the eligibility criteria are constitutional under either the *Anderson-Burdick* test or the unconstitutional-conditions doctrine.[3] Because the plaintiffs-appellants' challenge to the eligibility criteria is unlikely to succeed under either framework, however, "we need not choose between the two," *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 920 (6th Cir. 1998), and will instead discuss each one below.

### 1. The *Anderson-Burdick* Test

In *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), the Supreme Court articulated a "flexible standard," *Burdick*, 504 U.S. at 434, for a court to evaluate "[c]onstitutional challenges to specific provisions of a State's election laws," *Anderson*, 460 U.S. at 789. The *Anderson-Burdick* test may apply to First Amendment claims as well as to Equal Protection claims. *See Obama for Am. v. Husted*, 697 F.3d 423, 430 (6th Cir. 2012). Although most—if not all—of the cases considered by the Supreme Court and this court under the *Anderson-Burdick* test have involved laws that regulate the actual administration of elections, the rationales for applying the *Anderson-Burdick* test—ensuring that "the democratic processes" are "fair and honest," *Storer v. Brown*, 415 U.S. 724, 730 (1974), and "maintain[ing]

---

[3]The defendants-appellees also raise the possibility of the court applying the "deferential approach" that we discussed in *Citizens for Legislative Choice v. Miller*, 144 F.3d 916 (6th Cir. 1998). Unlike the well-established analytical frameworks we discuss herein, this approach has not been further developed by this court, so we do not consider it here.

the integrity of the democratic system," *Burdick*, 504 U.S. at 441—resonate here, too.  At bottom, the *Anderson-Burdick* framework is used for evaluating "state election law[s]," *Burdick*, 504 U.S. at 434, and a law restricting membership of the body that draws electoral lines could conceivably be classified as an "election law."  The Amendment is designed to further the exact goals described above:  It requires commissioners to "perform their duties in a manner that is impartial and reinforces public confidence in the integrity of the redistricting process."  MICH. CONST., art. IV, § 6(10).  For these reasons, we proceed to apply the *Anderson-Burdick* balancing test.

> In *Anderson*, the Supreme Court first articulated this test as follows:
>
> [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.  It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule.  In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

460 U.S. at 789.  The level of scrutiny under this test "depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights."  *Burdick*, 504 U.S. at 434.  In particular,

> when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance."  But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions.

*Id.* (citations omitted).  "Regulations falling somewhere in between—i.e., regulations that impose a more-than-minimal but less-than-severe burden—require a 'flexible' analysis, 'weighing the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it.'" *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016) (quoting *Green Party of Tennessee v. Hargett*, 767 F.3d 533, 546 (6th Cir. 2014)).  As we explained in *Miller*, determining whether the burden is severe or incidental requires examining "content-neutrality and alternate means of access."  144 F.3d at 921.  A law would not be content-neutral, and would

thus impose a severe burden, if it "limit[ed] political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." *Id.* (quoting *Anderson*, 460 U.S. at 793). And a law would impose a severe burden if it left "few alternate means of access to the ballot," "restrict[ing] 'the availability of political opportunity.'" *Id.* (quoting *Anderson*, 460 U.S. at 793).

On the question of content-neutrality, we concluded in *Miller* that a lifetime-term-limit law did not impose a severe burden because it

> burdens no voters based on "the content of protected expression, party affiliation, or inherently arbitrary factors such as race, religion, or gender." It burdens no voters based on their views on any of the substantive "issues of the day," such as taxes or abortion. Apart from the term limits issue, voters who favor experience are not in any sense a recognized "group," and we are aware of no historical bias against incumbent politicians or their supporters.

*Id.* at 922 (citations omitted). Each of these metrics for assessing content-neutrality yields the same result here. The Amendment's eligibility criteria do not burden the plaintiffs-appellants based on their status as Republicans, *cf. Elrod v. Burns*, 427 U.S. 347, 355 (1976) ("In order to maintain their jobs, respondents were required to pledge their political allegiance to the Democratic Party, work for the election of other candidates of the Democratic Party, contribute a portion of their wages to the Party, or obtain the sponsorship of a member of the Party . . . ."), or "on their views on any of the substantive 'issues of the day,'" *Miller*, 144 F.3d at 922, and neither Daunt nor MRP (with respect to its members) argues that there is a "historical bias" against them in their capacity as individuals with potential conflicts of interest, *id.* On the question of alternate means of availing oneself of political opportunities, the temporal limitation of the law in this case belies any suggestion that the burden is severe. *See Clements v. Fashing*, 457 U.S. 957, 967 (1982) ("A 'waiting period' is hardly a significant barrier to candidacy."). Moreover, "[p]laintiffs may run for any [nonpartisan] elected office; they may vote, distribute campaign literature, [and] voice their political opinions . . . ." *Grizzle v. Kemp*, 634 F.3d 1314, 1324 (11th Cir. 2011). The burden is not severe.

On the other end of *Anderson-Burdick*'s sliding scale, it may appear that the burden imposed by the eligibility criteria is not minimal because the criteria do not constitute a

"generally applicable, nondiscriminatory" regulation. *Obama for Am.*, 697 F.3d at 433–34; *see Burdick*, 504 U.S. at 434. Unlike, for example, "a flat ban on all forms of write-in ballots," which treats all voters equally, *Burdick*, 504 U.S. at 438, the Amendment targets specific classes of citizens based on their past political activities. And although there is no "federally protected interest" in holding state office, *Moncier v. Haslam*, 570 F. App'x 553, 559 (6th Cir. 2014) (collecting cases), several of the eligibility criteria clearly correspond to activities protected by the First Amendment. *See, e.g.*, *Elrod*, 427 U.S. at 370–71 (explaining that Supreme Court precedent explicitly regarded "political campaigning and management" as "activities . . . protected by the First Amendment"); *Autor v. Pritzker*, 740 F.3d 176, 182 (D.C. Cir. 2014) ("[R]egistered lobbyists are protected by the First Amendment right to petition."). Yet the Supreme Court has deemed similar restrictions on political expression to be minimal. *See Clements*, 457 U.S. at 967 (describing a two-year "waiting period" imposed on current officeholders before they could run for state legislature to be a "*de minimis* burden"); *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 550, 556 (1973) (Hatch Act's bar on federal employees "tak[ing] an active part in political management or in political campaigns" "did not interfere with a 'wide range of public activities'") (quoting *United Public Workers v. Mitchell*, 330 U.S. 75, 100 (1947)).

Even if the eligibility criteria imposed a moderate burden on activities actually protected by the First Amendment, however, the Amendment would easily satisfy *Anderson-Burdick*'s middle-ground, "flexible analysis," under which we "weigh[] the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it." *Green Party of Tennessee*, 767 F.3d at 546. The burden on the plaintiffs-appellants is relatively insignificant, given (1) their ability to serve on the Commission after their six-year period of ineligibility expires, (2) the lack of any direct prohibition or regulation of pure speech, *cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995), and (3) the absence of any fundamental right to be a member of the Commission, *see Snowden v. Hughes*, 321 U.S. 1, 6–7 (1944).[4] By contrast, Michigan has a compelling interest "in limiting the conflict of interest implicit in legislative control over

---

[4]Still, one would search in vain for any indication in this opinion that we will relax judicial scrutiny in the area of states structuring their governments "absent the infringement of a dramatic federal interest or a significant violation of constitutional rights." Concurring Op. at 37.

redistricting." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2676 (2015) (quoting Bruce Cain, *Redistricting Commissions: A Better Political Buffer?* 121 YALE L. J. 1808, 1808 (2012)) (alteration omitted). Furthermore, "[a]s a sovereign polity, Michigan has a fundamental interest in structuring its government." *Miller*, 144 F.3d at 923. The challenged provisions of the Amendment directly advance both of these interests. Accordingly, the district court did not abuse its discretion in concluding that the plaintiffs-appellants are unlikely to succeed on their First and Fourteenth Amendment claims against the eligibility criteria under the *Anderson-Burdick* test.

## 2. Unconstitutional Conditions

The other potential framework through which to evaluate the plaintiffs-appellants' challenge to the eligibility criteria is the unconstitutional-conditions doctrine. Rather than claiming a First Amendment right to sit on the Commission,[5] the plaintiffs-appellants claim First Amendment rights to engage in the political activities that make them ineligible for the governmental benefit of membership on the Commission. In *Perry v. Sindermann*, 408 U.S. 593 (1972), the Supreme Court held that the government

> may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which (it) could not command directly." Such interference with constitutional rights is impermissible.

*Id.* at 597 (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)). In other words, "[w]hat the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly." *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 77–78 (1990).

---

[5]This distinguishes their case from *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011), in which legislators unsuccessfully claimed that conflict-of-interest rules preventing them from voting on legislation violated their alleged First Amendment right to cast such legislative votes. *Carrigan*'s genealogy of conflict-of-interest rules is instructive, as discussed below, but its rejection of the idea that the First Amendment protects one's ability to cast a legislative vote is inapposite here. Daunt's and MRP's First Amendment claim deals with activities *outside* of the Commission, not whether they are entitled to sit on the Commission. *See* Daunt Br. at 28 (acknowledging that "there is no constitutional right to government employment").

As discussed above, *supra* Part II.B.1, it is clear that at least some of the activities restricted by the eligibility criteria are protected by the First Amendment. In light of the government's interest in avoiding partisan conflicts of interests and unsavory patronage practices, however, the Supreme Court has repeatedly held that these types of restrictions do not run afoul of the First Amendment or the Equal Protection Clause. First, in *United Public Workers of America (C.I.O.) v. Mitchell*, 330 U.S. 75 (1947), the Supreme Court addressed the constitutionality of the following sentence of the Hatch Act: "No officer or employee in the executive branch of the Federal Government . . . shall take any active part in political management or in political campaigns." *Id.* at 82. The Court upheld the provision, explaining that

> Congress and the President are responsible for an efficient public service. If, in their judgment, efficiency may be best obtained by prohibiting active participation by classified employees in politics as party officers or workers, we see no constitutional objection.

*Id.* at 99. Far from a wholesale ban on political expression, the provision "le[ft] untouched full participation by employees in political decisions at the ballot box and forb[ade] only the partisan activity of federal personnel deemed offensive to efficiency." *Id.* The Court dismissed the suggestion that no harm could be done by federal employees engaging in these activities in their "free time" outside work hours. *Id.* at 95. "The influence of political activity by government employees, if evil in its effects on the service, the employees or people dealing with them, is hardly less so because that activity takes place after hours." *Id.*

The Supreme Court again addressed this provision of the Hatch Act in *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548 (1973), and reaffirmed *Mitchell*.[6] In *Letter Carriers*, the Court was unequivocal in approving of Congress's power to cleanse the civil service of partisan conflicts of interests, stating that if Congress

---

[6]On the same day that it decided *Letter Carriers*, the Supreme Court upheld an Oklahoma statute that "restrict[ed] the political activities of the State's classified civil servants in much the same manner that the Hatch Act proscribe[d] partisan political activities of federal employees." *Broadrick v. Oklahoma*, 413 U.S. 601, 602 (1973). The relevant portions of the *Broadrick* decision, *see id.* at 616–18, mirror the *Letter Carriers* analysis, so we discuss only the latter.

forbade activities such as organizing a political party or club; actively participating in fund-raising activities for a partisan candidate or political party; becoming a partisan candidate for, or campaigning for, an elective public office; actively managing the campaign of a partisan candidate for public office; initiating or circulating a partisan nominating petition or soliciting votes for a partisan candidate for public office; or serving as a delegate, alternate or proxy to a political party convention[,]

such actions would "unquestionably be valid." *Id.* at 556. The Court explained that "the judgment of Congress, the Executive, and the country appears to have been that partisan political activities by federal employees must be limited if the Government is to operate effectively and fairly, elections are to play their proper part in representative government, and employees themselves are to be sufficiently free from improper influences." *Id.* at 564.

Finally, in *Clements v. Fashing*, 457 U.S. 957 (1982), the Supreme Court relied on *Mitchell* and *Letter Carriers* to uphold two sections of the Texas Constitution, the first of which prohibited certain officials from holding a seat in the state legislature prior to the expiration of their terms of office, and the second of which required an officeholder to resign before running for any other elected office. Whether under the Equal Protection Clause or the First Amendment, the Court held, "the burden on appellees' First Amendment interests in candidacy are so insignificant that the classifications of § 19 and § 65 may be upheld consistent with traditional equal protection principles." *Id.* at 971.[7] The Court plurality's application of rational-basis review under the Equal Protection Clause "dispose[d] of" the challengers' First Amendment claim. *Id.*

*Mitchell*, *Letter Carriers*, and *Clements* squarely foreclose the present challenge to the Amendment's eligibility criteria. Just as the Supreme Court in these cases permitted federal and state governments to restrict the "partisan political activity" of federal employees, *Mitchell*, 330 U.S. at 100, and state officeholders, *Clements*, 457 U.S. at 972, we discern no constitutional limitation on Michigan making the forbearance from such activity a condition of sitting on an

---

[7]Even Justice Brennan's dissenting opinion in *Clements*, which faulted the plurality for focusing its rational-basis review on whether the "*class* of candidates or voters that was burdened was somehow suspect" (for example, based on their wealth) instead of focusing on "the impact on the First Amendment *rights* of candidates and voters," acknowledged that "some greater deference may be due the State because these restrictions affect only public employees." 457 U.S. at 977–78 n.2 (Brennan, J., dissenting).

independent redistricting commission. MRP's attempt to distinguish these cases is unpersuasive. It points out that the Amendment, unlike the regulations in the abovementioned cases, does not limit itself to "address[ing] undue influence, or its appearance, on *current* public employees and officials" due to its retroactive effect. MRP Br. at 15. But Michigan's interest in addressing the *appearance* of undue influence—whether or not members of the Commission are "actively partisan," *Mitchell*, 330 U.S. at 98—permits it to disqualify not only active partisans but also those whose recent partisan involvement, or whose association with active partisans, could create the appearance that the Commission is staffed by political insiders. *See Letter Carriers*, 413 U.S. at 565 ("[I]t is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it."). Efforts to purge conflicts of interest from the democratic process "have been commonplace for over 200 years," *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122 (2011), and we are loath to disturb this longstanding practice, particularly when "public confidence in the integrity of the redistricting process" is at stake. MICH. CONST., art. IV, § 6(10); *see Rucho v. Common Cause*, 139 S. Ct. 2484, 2507 (2019) (noting states' interests in "restricting partisan considerations in districting" and citing Michigan Commission Amendment as example).

Beyond these Supreme Court cases, decisions of our sister circuits demonstrate that even when laws establish eligibility criteria for elected officeholders, thus burdening not only the candidates themselves but voters who may have otherwise sought to elect them, *see Bullock v. Carter*, 405 U.S. 134, 143 (1972), courts have applied a less-than-exacting standard of review. For instance, in evaluating a statute involving eligibility criteria for elected office, the Eleventh Circuit in *Grizzle v. Kemp*, 634 F.3d 1314 (11th Cir. 2011), declined to subject the statute to strict scrutiny. In *Grizzle*, the plaintiffs were disqualified from running for election to Georgia school boards because they had "immediate family member[s]" employed by their districts' school systems. *Id.* at 1316. After discussing numerous cases applying rational-basis review to laws establishing eligibility criteria for public office, the Eleventh Circuit followed suit, explaining that "the State may regulate one step at a time in order to address what it deems the most pressing issues." *Id.* at 1325. And in *Fletcher v. Marino*, 882 F.2d 605 (2d Cir. 1989), the Second Circuit applied rational-basis review to a law restricting certain political party officers from being elected to community school boards. *Id.* at 613; *see id.* at 612 ("[L]aws that

implicate, in a limited fashion, a person's rights to participate in politics and to serve as an elected official have survived review under the First Amendment and have not been subjected to strict scrutiny."). The laws at issue in these cases are highly similar to the eligibility criteria at issue here. In fact, the most salient difference—that the laws in these cases involved *elected* positions, whereas the Amendment does not—makes the argument for applying rational-basis review even stronger here, given that the eligibility criteria do not burden any voter's access to the ballot. Under rational-basis review, for the reasons discussed *supra* Part II.B.1, the Amendment is constitutional.

Furthermore, we note that the eligibility criteria do not represent some out-of-place addition to an unrelated state program; they are part and parcel of the definition of this Commission, of how it achieves independence from partisan meddling. This is critical to the constitutionality of a challenged program under the unconstitutional-conditions doctrine, as the Supreme Court's government-funding cases make clear. The Court has explained that although the Spending Clause of the Federal Constitution "includes an ancillary power to ensure that those funds are properly applied to the prescribed use," *Rust v. Sullivan*, 500 U.S. 173, 195 n.4 (1991), the government may not create as a funding condition "the affirmation of a belief that by its nature cannot be confined within the scope of the Government program." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 221 (2013) (hereinafter "*AOSI*"). In *AOSI*, this meant that a Policy Requirement conditioning the grant of public-health funds on recipients "explicitly agree[ing] with the Government's policy to oppose prostitution and sex trafficking" was unconstitutional. *Id.* at 213. The Supreme Court explained in *AOSI* that "the Policy Requirement goes beyond preventing recipients from using private funds in a way that would undermine the federal program. It requires them to pledge allegiance to the Government's policy of eradicating prostitution." *Id.* at 220. As in *AOSI*, here "[t]he line is hardly clear," *id.* at 215, but in our view, the Amendment does not go beyond preventing would-be commissioners from engaging in activity that would undermine the independence of Michigan's redistricting commission, nor does it require them to pledge allegiance to any governmental policy. Far from limiting the exercise of constitutional rights as extraneous conditions, the eligibility criteria themselves "define the limits" of the Commission. *Id.* at 214.

Also instructive in the unconstitutional-conditions context are the Supreme Court's political patronage cases, which address the propriety of "the conditioning of public employment on political faith." *Elrod*, 427 U.S. at 357; *see Branti v. Finkel*, 445 U.S. 507 (1980); *Rutan*, 497 U.S. 62. In *Elrod*, the Supreme Court held that the practice of patronage dismissals—firing public employees because they were not loyal to the incumbent party—violated the First and Fourteenth Amendments because these dismissals "severely restrict[ed] political belief and association." 427 U.S. at 372. In *Branti*, the Court followed *Elrod* in holding that "the continued employment of an assistant public defender cannot properly be conditioned upon his allegiance to the political party in control of the county government." 445 U.S. at 519. And in *Rutan*, the Court held that "the rule of *Elrod* and *Branti* extends to promotion, transfer, recall, and hiring decisions based on party affiliation and support." 497 U.S. at 79. Throughout these cases, the Court considered whether, as an exception to this general rule against patronage practices, "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved," *Branti*, 445 U.S. at 518, namely for certain "high-level employees," *Rutan*, 497 U.S. at 74, but never applied this exception.

On the one hand, this line of cases is clearly distinguishable, given that it involved individuals who faced adverse employment actions because of their association with a particular political party. In this case, by contrast, Daunt and others like him are barred from the Commission because of their associations with professional politics, regardless of which party they or their family member supported. Being fired from one's job because one is a Republican "unquestionably inhibits protected belief and association," *Elrod*, 427 U.S. at 359, in a way that the Amendment unquestionably does not. At first blush these cases appear to point in the opposite direction of *Mitchell*, *Letter Carriers*, and *Clements*, which *upheld* restrictions on who could hold office. Upon closer examination, however, the patronage cases actually reaffirm the principles articulated in *Mitchell*, *Letter Carriers*, and *Clements*. Indeed, the Supreme Court explained in *Elrod* that "the activities that were restrained by the legislation involved in [*Mitchell* and *Letter Carriers*] are characteristic of patronage practices"—that is, the same patronage practices that the Court in *Elrod* so harshly criticized. 427 U.S. at 367. In other words, barring governmental employees from "taking an active part in political management or political

campaigns," *Letter Carriers*, 413 U.S. at 554, served to "safeguard the core interests of individual belief and association" that patronage-based systems undermined. *Elrod*, 427 U.S. at 371. The *Elrod/Branti/Rutan* line of patronage cases thus supports the conclusion that the eligibility criteria do not impose an unconstitutional condition on the plaintiffs-appellants.

*\*\*\**

Under either of the foregoing analytical frameworks, the Amendment's eligibility criteria pass muster. The district court did not abuse its discretion in denying a preliminary injunction.

## C.  MRP's Freedom-of-Association Claim

MRP argues that the provision of the Amendment allowing applicants to self-identify as being affiliated with the Republican Party violates MRP's freedom of association. We conclude that MRP is unlikely to succeed on the merits of this claim because its argument overextends the Supreme Court's decision in *California Democratic Party v. Jones*, 530 U.S. 567 (2000), and mischaracterizes the nature of the Commission.

In *Jones*, the Supreme Court invalidated California's "blanket primary" system, in which all voters could vote for any candidate for nomination to public office, regardless of the candidate's party affiliation. The Court reasoned:

> In no area is the political association's right to exclude more important than in the process of selecting its nominee. That process often determines the party's positions on the most significant public policy issues of the day, and even when those positions are predetermined it is the nominee who becomes the party's ambassador to the general electorate in winning it over to the party's views. . . .
>
> Unsurprisingly, our cases vigorously affirm the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party "select[s] a standard bearer who best represents the party's ideologies and preferences."

*Id.* at 575 (quoting *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989)). The Supreme Court's decision to strike down the blanket-primary system was thus based on the California system's interference with a party's ability to select its nominee in a representative election. A decade later, in *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008), the Supreme Court explicitly cabined its *Jones* holding

to prohibit only those primary systems that allow voters of any affiliation to "choose parties' nominees." *Id.* at 453. Unlike in *Jones*, the Washington primary system in *Washington State Grange* simply provided that "[t]he top two candidates from the primary election proceed to the general election regardless of their party preferences," and "[w]hether parties nominate their own candidates outside the state-run primary is simply irrelevant." *Id.* In other words, "[t]he essence of nomination—the choice of a party representative—does not occur under [Washington's primary system]. The law never refers to the candidates as nominees of any party, nor does it treat them as such." *Id.*

This narrow inquiry into whether the challenged system actually involves the selection of a party's nominees dooms MRP's freedom-of-association claim. As Secretary Benson argues, "in relying on *Jones*, MRP's claim rests almost entirely upon the premise that Commission members are something that the Constitution says they cannot be—party officials." Benson Br. at 69. On the other hand, even if the self-designated "Republicans" on the Commission are not technically elected to represent the Republican Party or labeled as such upon their installment, the Amendment's effort to ensure ideological diversity on a Commission that debates "inherently political" issues confirms that these Republican commissioners are, in some sense, representatives of a Republican point of view. MRP Br. at 8. We agree that, in some sense, the Commission's design reflects a general commitment to representing different perspectives. VNP even acknowledges that the Commission's structure "serves to ensure that the Commission's decisions reflect some level of bipartisan or cross-partisan support." VNP Br. at 39. Even if the commissioners are constitutionally bound to *avoid* drawing maps that disproportionately favor a political party, MICH. CONST., art. IV, § 6(13)(d), it is diverse ideological representation—and consensus, *see id.* § 6(14)(c) (requiring a final decision on a redistricting plan to have the support of at least two commissioners who identify with each of the major parties and at least two who do not affiliate with either major party)—that will theoretically prevent such results.

Yet *Jones* and *Washington State Grange* permit freedom-of-association claims in this context only when a narrower form of political representation is at issue. In particular, these cases speak of an *elected* "standard bearer," *Jones*, 530 U.S. at 575 (quoting *Eu*, 489 U.S. at 224), whose representation can result in "political power in the community," *id.* (quoting

*Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 216 (1986)). Political parties must be able to retain control over their nominees for elected office precisely because these nominees are supposed to approach their work in accordance with a particular political ideology. By contrast, the commissioners here are not elected, and their duties do not include translating "common principles" with party adherents into "concerted action." *Tashjian*, 479 U.S. at 216. Standard bearers in *Jones* were supposed to fight for partisan ends; commissioners here are prohibited from doing so.

Moreover, MRP conflates identification with the Republican Party and identification with MRP. Applicants do not have the option of self-identifying as affiliates of the *Michigan* Republican Party; all they can do is check a box next to the statement, "I affiliate with the Republican Party." *See* Application for Michigan Independent Citizens Redistricting Commission at 3, The Office of Secretary of State Jocelyn Benson, https://www.michigan.gov/d ocuments/sos/Michigan__Independent__Citizens_Redistricting_Commission_booklet_669598_7 .pdf. MRP does not explain why, as a state affiliate of the Republican Party, it should have the right to control the affiliation of Michigan citizens with the national party. Indeed, as VNP points out, MRP may diverge from the Republican National Committee on an issue related to those before the court in this case. Whereas MRP seeks strict-scrutiny review of Michigan's partisan-balanced Commission, the Republican National Committee has filed an amicus brief with the Supreme Court urging it to apply a "comparatively lenient standard of review" when considering the constitutionality of Delaware's political-balance requirement for state judicial service, *Amicus Curiae* Brief of the Republican National Committee in Support of Petitioner at 5, No. 19-309, *Carney v. Adams*, 140 S. Ct. 602 (2019). Particularly in light of apparent differences between the MRP and the Republican Party generally, it is unclear why the former would have the right to say who cannot affiliate with the latter.

Furthermore, MRP's argument that commissioners will be standard bearers because they must weigh political matters in "public meetings, available for all to see," MRP Br. at 8, is directly foreclosed by *Washington State Grange*. In that case, the Supreme Court considered the Washington Republican Party's argument that "even if the [state's] primary does not actually choose parties' nominees, it nevertheless burdens their associational rights because voters will

assume that candidates on the general election ballot are the nominees of their preferred parties." 552 U.S. at 454. The Court characterized this as a concern that "voters will be confused by candidates' party-preference designations." *Id.* Such concern, the Court explained, was "sheer speculation":

> It "depends upon the belief that voters can be 'misled' by party labels. But '[o]ur cases reflect a greater faith in the ability of individual voters to inform themselves about campaign issues.'" There is simply no basis to presume that a well-informed electorate will interpret a candidate's party-preference designation to mean that the candidate is the party's chosen nominee or representative or that the party associates with or approves of the candidate. This strikes us as especially true here, given that it was the voters of Washington themselves, rather than their elected representatives, who enacted [the challenged law].

*Id.* at 454–55 (citations omitted). In similar fashion, it was the voters of Michigan themselves, rather than their elected representatives, who enacted the Amendment. Even a commissioner's public identification as a Republican would not create a presumption that Michigan's "well-informed electorate" will believe that this commissioner is a delegate of the Michigan Republican Party. This concern over confusion is even less significant here than in *Washington State Grange*, because here the relevant individual's self-identification with a political party exists outside the context of a representative election—there is no risk that a voter will accidentally vote for an individual who has fraudulently identified themselves as an affiliate of the Republican Party.

MRP further argues that "randomly selecting commissioners from th[e] pool cannot cure the harm" of initially allowing applicants to "self-designate as affiliates of MRP." MRP Br. at 11. This statement ignores the full scope of the Amendment. To assert that "the damage is done" after the initial self-affiliation stage, MRP Br. at 11, overlooks the party's ability—through its affiliated legislators—to strike up to ten applicants from the randomly selected pool of 200 applicants. MICH. CONST., art. IV, § 6(2)(d)(ii), (e). MRP contends that it "will have no reliable means to determine an applicant's true political affiliation," MRP Br. at 11, but the commissioner application includes a section in which the applicant is asked to respond to the following two prompts: "Why do you want to serve on the Michigan Independent Citizens Redistricting Commission?" and "Describe why or how you affiliate with either the Democratic

Party, the Republican Party, or why you don't affiliate with either." Appl. at 5. If a Republican legislator finds an applicant's response to be objectionable or unsatisfying, or if the legislator is suspicious of an applicant's failure to fill out this section at all, the legislator may strike this applicant. *See* Brennan Center Br. at 24 ("These peremptory strikes ensure that legislative leaders can eliminate potential Commissioners whose presence on the Commission they would find particularly objectionable . . . .").

In sum, MRP fails to demonstrate that it has a First Amendment right to control the self-affiliation of commissioner-applicants with the Republican Party. Accordingly, the district court did not abuse its discretion in concluding that MRP is unlikely to succeed on its freedom-of-association claim.

**D. MRP's Freedom-of-Speech Claim**

MRP argues that "[t]he Amendment imposes a content-based regulation that prohibits speech regarding an entire topic, one involving core political speech that is at the heart of First Amendment protection." MRP Br. at 27. As recounted above, the Amendment states that commissioners

> shall not discuss redistricting matters with members of the public outside of an open meeting of the commission, except that a commissioner may communicate about redistricting matters with members of the public to gain information relevant to the performance of his or her duties if such communication occurs (a) in writing or (b) at a previously publicly noticed forum or town hall open to the general public.

MICH. CONST., art. IV, § 6(11). In MRP's view, the absence of any language that limits this restraint to speech made by commissioners in their official capacity makes this a content-based regulation "target[ing] a specific subject matter—redistricting," rendering it subject to strict scrutiny. MRP Br. at 28. *Contra Daunt*, 2019 WL 6271435, at *21 ("The restriction at issue applies only to official speech made by commissioners in their official capacity."). Secretary Benson responds that MRP lacks standing to bring this claim, and that the Amendment either restricts only the official speech of commissioners or it permissibly limits their private speech on a matter of public concern under *Garcetti v. Ceballos*, 547 U.S. 410 (2006). *See* Benson Br. at 82–86. To these arguments VNP adds that the court should construe the Amendment to avoid

constitutional difficulty if possible, and that the speech provision can be upheld as a "time, place, and manner" restriction.  VNP Br. at 47.  We first address whether MRP has standing to bring this claim, and then turn to the merits.

## 1. Associational Standing

Article III requires that a plaintiff have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  An injury, for standing purposes, means the "invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent.'"  *Lujan*, 504 U.S. at 560 (citations omitted).  An association has the right to sue in lieu of its individual members when:  "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

MRP can adequately demonstrate that its members would otherwise be able to satisfy *Lujan*'s requirements for Article III standing.  Beginning with injury-in-fact, the injury is "concrete and particularized":  It would harm MRP members' "concrete, personal interest" in speaking about redistricting matters if selected for the Commission, *Allen*, 468 U.S. at 756; *see Morrison v. Bd. of Educ. of Boyd Cty.*, 521 F.3d 602, 610 (6th Cir. 2008) (identifying "enforcement of a challenged statute" as a concrete harm).  It is also imminent:  Applications for the Commission are now available, and MRP members who might otherwise apply for the Commission might opt not to apply because joining the Commission will allegedly impair their interest in speaking about redistricting.  The injury-in-fact is therefore imminent because the members' "'intention to engage in a course of conduct' implicating the [First Amendment] and [] the threat of enforcement of the challenged law against the [members] is 'credible.'"  *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 451–52 (6th Cir. 2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).  Secretary Benson and VNP do not argue that MRP has failed to prove that this injury is fairly

traceable to Benson's allegedly unlawful conduct and that the injury is likely to be redressed by the requested relief, and it is clear that MRP's challenge satisfies both of these prongs of the standing analysis.

MRP is also able to demonstrate that the interests that it seeks to protect—the free-speech rights of its members who might serve on the Commission—are germane to the organization's purpose. As a political party, MRP has an interest in its members—including those serving on the Commission—speaking freely about the highly contentious subject of redistricting, a subject that directly affects MRP's political power. Finally, this claim does not require the participation of individual MRP members. For these reasons, we conclude as a preliminary matter that MRP has associational standing to challenge the speech provision of the Amendment.

## 2. Merits

We agree with the district court that the speech provision is constitutional, but not for the reason it articulated. The district court concluded that the provision "applies only to official speech made by commissioners in their official capacity," *Daunt*, 2019 WL 6271435, at *21, but did not explain how the plain text of the provision supported that reading. In support of this reading, VNP argues that the provision's language allowing the commissioners to discuss redistricting in order "to gain information relevant to the performance of his or her duties" limits the scope of the entire provision to speech involving official duties. VNP Br. at 47 (quoting MICH. CONST., art. IV, § 6(11)). But we believe the opposite to be true. The quoted language appears in an exception, suggesting that all discussion of redistricting matters with the public is prohibited *other than* official speech in certain designated forums. Indeed, a flat bar on commissioners otherwise discussing redistricting matters with the public is precisely what Secretary Benson defends. Benson Br. at 86 ("With 13 members, there will be 13 individual views about the process, and individual statements about the redistricting without other members present may result in misleading or inaccurate information being presented to the public as the Commission's official position."). Secretary Benson also offers an even more speech-restrictive argument: In contending that MRP fails to explain how commissioners could possibly speak about redistricting matters "in any manner *other* than in their official capacity," *id.* at 84, she assumes that any speech about redistricting by a commissioner is *per se* official speech, in stark

contradiction to the teachings of *Garcetti* and its progeny, which emphasize that "a citizen who works for the government is nonetheless a citizen," *Garcetti*, 547 U.S. at 419, and may speak as a citizen even on matters relating to her or his job, *see Lane v. Franks*, 573 U.S. 228, 238 (2014) ("Truthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes. That is so even when the testimony relates to his public employment or concerns information learned during that employment."). Neither this argument nor the district court's narrow reading finds support in the plain text of the provision or in the employee-speech cases.

In our view, the challenged provision indeed circumscribes some speech made in a commissioner's capacity as a private citizen, but nevertheless survives constitutional scrutiny under *Garcetti*. Specifically, the provision imposes speech restrictions that are tailored to ensuring that the Commission "operate[s] efficiently and effectively," *Garcetti*, 547 U.S. at 419, in two distinct ways. First, it prevents the "extract[ion] [of] gossip from commissioners." Benson Br. at 87. The potential for commissioners, while speaking in their private capacities, to disclose "sensitive, confidential, or privileged information," *Lane*, 573 U.S. at 242, relating to the redistricting commission supports the state's interest in closely regulating the speech of these commissioners. *See Sims v. Metro. Dade County*, 972 F.2d 1230, 1237 (11th Cir. 1992) ("[W]hen the employee serves in a sensitive capacity that requires extensive public contact, the employee's private speech may pose a substantial danger to the agency's successful functioning."). Second, the provision ensures that outsiders do not "influence the[] [commissioners'] votes out of public view." Benson Br. at 87. MRP argues that the Amendment is not "narrowly tailored" and that Michigan law already contains a "less restrictive alternative" to the Amendment, MRP Br. at 30, but this cites an inapplicable standard. The question is not whether the speech provision survives strict scrutiny, but "whether [Michigan] had an adequate justification for treating the [commissioners] differently from any other member of the general public," *Garcetti*, 547 U.S. at 418, who are free to discuss redistricting matters without consequence. Although the provision does burden the commissioners' freedom to speak openly about redistricting, this burden is outweighed by Michigan's more-than-adequate justifications for limiting speech by commissioners on redistricting matters.

For these reasons, the district court did not abuse its discretion in concluding that MRP is unlikely to prevail on the merits of its freedom-of-speech claim against the speech provision of the Amendment.

**E. MRP's Viewpoint-Discrimination Claim**

MRP argues that "the Amendment expressly discriminates against applicants based on their political viewpoint, specifically favoring those applicants who do not affiliate with either major political party over applicants who affiliate with either major party." MRP Br. at 24. This argument falls significantly short of demonstrating a likelihood of success on the merits.

Although Secretary Benson suggests that MRP's argument is "ambiguous on what 'viewpoint' [MRP] seek[s] to claim as being affected by the amendment," Benson Br. at 80, in our view MRP's argument is relatively clear: The "'do not affiliate with either major political party' perspective," MRP Br. at 25, which is guaranteed five seats, is favored over the Republican perspective, which is guaranteed four seats. That this "non-affiliated" perspective is also similarly favored over the Democratic perspective does not, by itself, foreclose the possibility that impermissible viewpoint discrimination is afoot.[8] Indeed, on this limited point, the Supreme Court has acknowledged that a party may claim viewpoint discrimination even when it is not the only one targeted for censorship. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831–32 (1995) ("The dissent's declaration that debate is not skewed so long as multiple voices are silenced is simply wrong; the debate is skewed in multiple ways.").

Yet in order for MRP to demonstrate that the Amendment constitutes targeting by the government of "particular views taken by speakers on a subject," *id.* at 829, it would need to demonstrate that something about allocating five seats to "not affiliated" individuals constitutes differential treatment of Republicans on the basis of their views. Were these five seats allocated to members of an identifiable third party, this showing would not be difficult, as members of this hypothetical third party—associated with particular views—would be numerically favored over

---

[8]In this section, we refer to the "not-affiliated" perspective as shorthand for "not affiliate[d] with either of the two major parties," as opposed to "not affiliated with any party." *See* MICH. CONST., art. IV, § 6(2)(a)(iii).

self-identified Republicans with their associated views. MRP's claim, by contrast, must ascend a significantly steeper hill, given that the non-affiliated pool of applicants will be filled by individuals with either a third-party affiliation or with no party at all. Still, the fact that the third pool is open to any "non-affiliated" applicant does not itself make MRP's viewpoint-discrimination argument impossible, even with the knowledge that Democrats and Republicans are treated equally under the Amendment. If the Commission had, for example, 100 commissioners, with only two slots open for members of the two largest parties, and the remaining ninety-eight seats reserved for individuals who did not affiliate with either major party, this structure would begin to look more like one that discriminated against majoritarian viewpoints. Yet the Amendment provides for affiliates of the two largest parties to represent eight out of thirteen seats on the Commission (a majority), so discrimination against the Republican viewpoint *as a majority viewpoint* is absent. And MRP does not explain how discrimination against the Republican viewpoint itself has occurred absent a showing that "the five unaffiliated commissioners will constitute a monolithic bloc . . . ." VNP Br. at 41.

In our view, the Supreme Court's "secondary effects" doctrine, articulated in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), provides a useful analogue for alternatively evaluating MRP's argument. In *Renton*, the Supreme Court reviewed and reaffirmed its prior holding that a zoning ordinance "designed to combat the undesirable secondary effects" of a business that purveyed sexually explicit material would not be struck down as an attempt to prevent the dissemination of this type of speech. *Id.* at 49. The Court explained that the government could accord differential treatment to a content-defined subclass of speech because that subclass was associated with specific "secondary effects" of the speech, meaning that the differential treatment was "*justified* without reference to the content of the . . . speech." *Id.* at 48 (quoting *Va. Pharmacy Bd. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976)).

That subclass of speech, in this case, would be speech associated with the two largest parties, and the Amendment's regulation of it would be "*justified* without reference to the content of the . . . speech." *Id.* The language of the Amendment makes this plain. It allocates commissioner seats based not on identifiable political parties, but on the content-neutral majority

or minority status of the party with which the applicant identifies. The limitation on seats for Democratic- and Republican-affiliating applicants is not designed to prevent the dissemination of these parties' ideas, but rather to combat the undesirable "secondary effect" of excluding those who do not affiliate with the two major parties (or conversely, the effect of disproportionately including those who affiliate with the two major parties). The fact that the Amendment could have the effect of limiting a Republican viewpoint is not the basis upon which the differential treatment is justified. The Amendment is structured to distinguish between applicants based upon their identification with the two major parties or their non-affiliation. "These bases for distinction refute the proposition that the selectivity of the restriction is 'even arguably "conditioned upon the sovereign's agreement with what a speaker may intend to say."'" *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992) (quoting *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 555 (1981) (Stevens, J., dissenting in part)).

Another reason MRP's viewpoint-discrimination argument is unlikely to succeed is that the non-affiliating "viewpoint" has no greater sway in the actual decisionmaking of the Commission than the Democratic or Republican viewpoint. A final decision of the Commission in adopting a redistricting plan requires a majority vote that includes at least two commissioners affiliated with each of the major parties and at least two who do not affiliate with either major party. MICH. CONST., art. IV, § 6(14)(c). The non-affiliating "viewpoint" is thus treated the same as the two other viewpoints.

MRP promotes the selection schemes of the Idaho and Arizona redistricting commissions, but both schemes virtually guarantee that the resulting commissions will be predominantly filled with adherents of the two largest political parties. Idaho's scheme puts full appointment power in the hands of the legislative leaders and state chairmen of the "two largest political parties," ID. CONST., art. III, § 2(2), and Arizona's lets the majority and minority legislative leaders—i.e. the heads of the two largest political parties—pick four commissioners, who in turn select a fifth commissioner who is not registered with a party already "represented" on the commission, AZ. CONST., art. IV, pt. 2, § 1(6), (8). Even Arizona's scheme leaves the choice of who will serve as the non-major-party commissioner up to the four commissioners who are registered with the two largest parties. *Id.* at § 1(8). Michigan's effort to ensure that a

sizeable minority of the members of its redistricting commission are non-affiliated with the two major parties does not run afoul of the First Amendment, particularly given the Supreme Court's repeated recognition of state and local governments' interests in guaranteeing minority representation. *See, e.g.*, *Hechinger v. Martin*, 411 F. Supp. 650 (D.D.C. 1976), *aff'd*, 429 U.S. 1030 (1977) (mem.) (affirming a three-judge district court's conclusion that D.C. act guaranteeing representation of political minorities on the city council was constitutional); *LoFrisco v. Schaffer*, 341 F. Supp. 743 (D. Conn.), *aff'd*, 409 U.S. 972 (1972) (mem.) (affirming a three-judge district court's conclusion that state minority representation statutes were constitutional).

For these reasons, the district court did not abuse its discretion in concluding that MRP is unlikely to succeed on its viewpoint-discrimination argument.

## F. The Remaining Preliminary-Injunction Factors

"[O]ur cases warn that a court must not issue a preliminary injunction where the movant presents no likelihood of merits success." *La.-Pac. Corp. v. James Hardie Bldg. Prod., Inc.*, 928 F.3d 514, 517 (6th Cir. 2019); *see Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 527 (6th Cir. 2017) ("As long as there is some likelihood of success on the merits, these factors are to be balanced, rather than tallied."); *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 752 (8th Cir. 2008) ("Whether the grant of a preliminary injunction furthers the public interest in such a case is largely dependent on the likelihood of success on the merits because the protection of constitutional rights is always in the public interest."). Without any likelihood of success in demonstrating the existence of a constitutional violation, Daunt and MRP fail to demonstrate that they will suffer irreparable injury in the absence of a preliminary injunction. As for the remaining parts of the preliminary-injunction analysis, the public-interest factor "merge[s]" with the substantial-harm factor when the government is the defendant, *Nken v. Holder*, 556 U.S. 418, 435 (2009), and neither of these factors can be satisfied when the challenged provisions are constitutional.

### III.  CONCLUSION

For the foregoing reasons, the district court did not abuse its discretion in denying the plaintiffs-appellants' motions for a preliminary injunction.  Accordingly, we **AFFIRM** the judgment of the district court.

---

**CONCURRING IN THE JUDGMENT**

---

CHAD A. READLER, Circuit Judge, concurring in the judgment. I concur in the judgment, which affirms the denial of preliminary relief to Plaintiffs. In the face of somewhat novel claims, the majority opinion appropriately pays deference to a sovereign state's decision as to self-governance. I write separately to emphasize one broad area of agreement with the majority opinion, and one area of pointed disagreement.

1. Starting with a point of disagreement. While all agree the deference due Michigan compels today's result, the legal framework for reaching that conclusion is not the *Anderson-Burdick* test. *Anderson-Burdick* is tailored to the regulation of election mechanics. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008) ("In later election cases we have followed *Anderson*'s balancing approach."); *Burdick v. Takushi*, 504 U.S. 328, 433 (1992) (applying *Anderson* and noting that "[e]lection laws will invariably impose some burden upon individual voters"); *Stein v. Thomas*, 672 F. App'x 565, 570 (6th Cir. 2016) ("When evaluating whether state election procedures violate First and Fourteenth Amendment election rights, we use [*Anderson-Burdick*]."). Following the Supreme Court's lead, we have thus utilized that framework in cases where it is alleged that a state election law burdens voting, from ballot-access laws, *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 693 (6th Cir. 2015), to early-voting regulations, *Obama for Am. v. Husted*, 697 F.3d 423, 430 (6th Cir. 2012), to prohibitions on party-line voting. *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 662 (6th Cir. 2016).

But Michigan's redistricting initiative does not regulate the mechanics of an election. Far from it, in fact. It simply sets the qualifications for Michigan residents who, if they satisfy certain eligibility criteria and are selected by the Secretary of State, will serve as commissioners who, working together as a commission, will draw electoral districts for the State, districts in which as-yet-unknown candidates will seek legislative office in a general election, following party primaries. In other words, the only sense that an election comes into play is the one that will ensue once these many tasks are completed. And neither the commissioners nor the

commission, it bears noting, will have an impact or influence on how that election is administered.  As the majority opinion thus seemingly acknowledges, it is quite a jurisprudential leap to view this case through *Anderson-Burdick*'s election-focused lens.  *See* Majority Op. at 10, 12 (noting that *Anderson-Burdick* "may apply" here because the law in question "could conceivably be classified as an 'election law'").

Fairly understood, today's case raises a question regarding Michigan's chosen means of self-governance, not its election mechanics.  Unlike the narrow set of election cases in which the right to vote arguably is at issue, this case, and others like it, more broadly address limitations on public service.  *See Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 924 (6th Cir. 1998) (noting the difference between "election process" cases and term-limit cases, with the later "implicat[ing] a different, and in some respects far more important interest: the State's power to prescribe qualifications for its officeholders").  And as there is "no federally protected interest in seeking" public office, "*Anderson* and *Burdick* bear little weight" in resolving state law limitations on public service, whether they limit service in a judicial position or as a districting commissioner.  *Moncier v. Haslam*, 570 F. App'x 553, 559 (6th Cir. 2014) (declining to apply *Anderson-Burdick* to a challenge to state judicial qualifications law as the framework does not "mandate[] that states organize their governments in a particular manner"); *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 344–45 (1995) (declining to apply *Anderson-Burdick* where "we are not faced with an ordinary election restriction"); *Schmitt v. LaRose*, 933 F.3d 628, 644 (6th Cir. 2019) (Bush, J., concurring) (noting that "this circuit has generally limited the application of *Anderson* and *Burdick* to . . . laws that burden candidates from appearing on the ballot"); *Bates v. Jones*, 131 F.3d 843, 859 (9th Cir. 1997) (Rymer & O'Scannlain, JJ., concurring) ("I would not start by analyzing Proposition 140 under the *Anderson/Burdick* test, because terms limits are a qualification for office—not for access to the ballot.").  If *Anderson-Burdick* can be stretched this far, why would it not reach any situation that tangentially touches elected office?  Laws, for instance, that regulate campaign finance, the conduct of legislators, or the terms of service of elected judges.  Seemingly none would be immune from *Anderson-Burdick*'s growing reach.

The temptation to overindulge in the *Anderson-Burdick* test has not gone unnoticed. For example, although we have frequently applied *Anderson-Burdick* in resolving Equal Protection claims, we recently questioned "whether the Supreme Court ever intended *Anderson-Burdick* to apply to Equal Protection claims," as the Supreme Court has "only applied the framework in the context of generally applicable laws." *Mays v. LaRose*, 951 F.3d 775, 783 n.4 (6th Cir. 2020). One reason *Anderson-Burdick* is a poor vehicle in that context is that it can take "some legal gymnastics to quantify the 'burden' that the State's disparate treatment places on" one's "right to vote," when a law treats groups differently, but does not necessarily "burden" either one. *Id.*; *see Crawford*, 553 U.S. at 207 (Scalia, Thomas, & Alito, JJ., concurring) ("Insofar as our election-regulation cases rest upon the requirements of the Fourteenth Amendment, weighing the burden of a nondiscriminatory voting law upon each voter and concomitantly requiring exceptions for vulnerable voters would effectively turn back decades of equal-protection jurisprudence.") (internal citations omitted). Here too, the Michigan redistricting initiative has no actual impact (let alone burden) on voting. Rather, it is an exercise in regulating the qualifications for public service. In that setting, just as in the Equal Protection setting, we would be wise to forego *Anderson-Burdick*.

My concern is more than conceptual. For *Anderson-Burdick* is a dangerous tool. In sensitive policy-oriented cases, it affords far too much discretion to judges in resolving the dispute before them. *Anderson-Burdick* relies on a sliding scale to weigh the burden a law imposes against the corresponding state interests in imposing the law. *See Crawford*, 553 U.S. at 190; *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) ("[W]e weigh . . . the burden the State's rule imposes on [First and Fourteenth Amendment] rights against the interests the State contends justify that burden . . . ." (citing *Burdick*, 504 U.S. at 434)). We have thus described "the *Anderson-Burdick* test" as a quintessential "balancing test." *Ohio Council 8 Am. Fedn. of State v. Husted*, 814 F.3d 329, 334–35 (6th Cir. 2016) (holding that "the state's interest is sufficient to outweigh that minimal burden"). But the test otherwise does little to define the key concepts a court must balance, including when a burden becomes "severe." *See Crawford*, 553 U.S. at 191 (stating that in prior cases the Supreme Court did not "identify any litmus test for measuring the severity of a burden that a state law imposes on a political party, an individual voter, or a discrete class of voters"); *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182,

208 (1999) (Thomas, J., concurring) ("When an election law burdens voting and associational interests, our cases are much harder to predict, and I am not at all sure that a coherent distinction between severe and lesser burdens can be culled from them."); *Timmons*, 520 U.S. at 359 (noting that "[n]o bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms" (citing *Storer v. Brown*, 415 U.S. 724, 730 (1974))); *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 443 (6th Cir. 2016) (noting that "[t]he distinction between 'severe burdens' and 'lesser' ones is often murky" (citing *Buckley*, 525 U.S. at 207 (Thomas, J., concurring))). Absent stricter rules and guidelines for courts to apply, *Anderson-Burdick* leaves much to a judge's subjective determination.

Compare *Anderson-Burdick* to a more bright-line rule a court might employ in this setting. Bright-line rules "have numerous advantages." Alex Kozinski, *My Pizza with Nino*, 12 CARDOZO L. REV. 1583, 1588–89 (1990). One is predictability. *Id.*; *see also Perdue v. Kenny A. ex rel Winn*, 559 U.S. 542, 551–52 (2010) (rejecting a 12-factor balancing test in favor of an "objective" calculation that "cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results"). Another is restraint: "they constrain future decisionmakers so they cannot introduce their own personal preferences into the decision." Kozinski*, supra*, at 1589. Yet another is that "they enhance the legitimacy of decisions because they make it clear to the litigants that their case was decided through neutral application of a rule rather than on the basis of a judge's personal preference." *Id.*; *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 136 (2014) (declining to apply a balancing test to determine if a plaintiff can sue under the Lanham Act as "experience has shown that . . . open-ended balancing tests . . . can yield unpredictable and at times arbitrary results"). With advance understanding of the legal rules to be applied, a state can govern accordingly. *See Crawford*, 553 U.S. at 208 (Scalia, Thomas, & Alito, JJ., concurring) ("Judicial review of [state legislatures'] handiwork must apply an objective, uniform standard that will enable them to determine, *ex ante*, whether the burden they impose is too severe.").

But advance understanding is not a virtue of *Anderson-Burdick* review. *See id.* (criticizing the lead opinion's application of *Anderson-Burdick* because "[t]he lead opinion's record-based resolution of these cases . . . provides no certainty"); *see also* Edward. B. Foley,

*Voting Rules and Constitutional Law*, 81 GEO. WASH. L. REV. 1836, 1859 (2013). Rather, tests like *Anderson-Burdick* allow a judge "easily [to] tinker[] with levels of scrutiny to achieve [his or her] desired result." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2327 (2016) (Thomas, J., dissenting); *see also United States v. Virginia*, 518 U.S. 515, 567 (1996) (Scalia, J., dissenting) (noting that varying levels of scrutiny add "a further element of randomness" in "that it is largely up to us which test will be applied in each case"). *Anderson-Burdick*'s "touchstone" may well be "its flexibility in weighing competing interests," *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016), but judicial flexibility in picking winners and losers in sensitive disputes rarely furthers the interests of justice. *See* Antonin Scalia, *The Rule of Law as A Law of Rules*, 56 U. CHI. L. REV. 1175, 1187 (1989) (noting that "balancing modes of analysis" should "be avoided where possible"). In the name of "flexibility," *Anderson-Burdick* risks trading precise rules and predictable outcomes for the imprecision and unpredictability of how the judicial-assignment wheel turns. *Cf. Edwards v. Aguillard*, 482 U.S. 578, 640 (1987) (Scalia, J. & Rehnquist, C.J., dissenting) (arguing that the Supreme Court should "sacrifice some 'flexibility' for 'clarity and predictability'" by "[a]bandoning *Lemon*'s purpose test"). Indeed, one commentator has described *Anderson-Burdick* as "such an imprecise instrument that it is easy for the balance to come out one way in the hands of one judge, yet come out in the exact opposite way in the hands of another." Foley, *supra*, at 1859. And that is especially worrisome in the context of cases that, even in a deeply-attenuated sense, impact an election. In those delicate matters, we should be hesitant to embrace a test so "indeterminate" that it results in "the federal constitutional law that [supervises] the operation of a state's electoral process ha[ving] little objectivity or predictability." *Id.*; *see Hellerstedt*, 136 S. Ct. at 2328 (Thomas, J., dissenting) ("The Court should abandon the pretense that anything other than policy preferences underlies its balancing of constitutional rights and interests in any given case."). I am thus understandably reluctant to apply *Anderson-Burdick* even in resolving election disputes, let alone extending it to today's non-election setting.

A preferable means of "[j]udicial review of [a state's] handiwork," to my mind, would "apply an objective, uniform standard" for measuring an election regulation. *Crawford*, 553 U.S. at 208 (Scalia, Thomas, & Alito, JJ., concurring). For in the absence of objective limiting principles, we risk "the validity of a doctrine" before us being resolved on the unbecoming basis

of "whose ox it gores." *Wells v. Simonds Abrasive Co.*, 345 U.S. 514, 525 (1953) (Jackson, Black, & Minton, JJ., dissenting). Perhaps the best means of tempering that risk is judicial decisionmaking that turns on the application of historical understandings and foundational principles, as well as one that affords appropriate deference to a state's strong interest in self-governance. *See Miller*, 144 F.3d at 925 (identifying a "workable, deferential test for evaluating state decisions regarding their governmental structure," one that "grants the States the required deference").

2. In many respects, the majority opinion relies upon a framework based in history and long-standing principles. Which takes me to an area of agreement and some relevant background. Through a series of decisions, the Supreme Court has considered what standards a court is to apply when considering challenges to the drawing of legislative district lines. The most recent of those decisions explained that many of these disputes are non-justiciable political questions, to be resolved by the political branches of government, not the federal courts. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506–07 (2019). In so holding, the Supreme Court foreshadowed states "actively addressing [political gerrymandering] on a number of fronts," identifying those who already were "restricting partisan considerations in districting . . . by placing power to draw electoral districts in the hands of independent commissions." *Id.* at 2507.

Even before *Rucho*, Michigan had taken up that suggestion. Through a ballot initiative, Michigan voters vested district-line-drawing duties in a citizen commission. Federal constitutional litigation ensued. By virtue of that litigation, we are now asked to resolve whether Michigan drew constitutionally-appropriate lines of qualification for its district line-drawers.

Just as there are no perfect electoral map lines, nor are there perfect lines delineating who should undertake that line-drawing process. *See id.* at 2499–2501 (commenting on the difficulty of defining a "fair" way to draw legislative lines). But whether a state's task be district-line-drawing or setting the rules for its elections, I (like the majority opinion) am reluctant to interfere with a state's effort to structure its system of government, to which we owe significant deference, absent the infringement of a dramatic federal interest or a significant violation of constitutional rights. *See Crawford*, 553 U.S. at 208 (Scalia, Thomas, & Alito, JJ., concurring)

(observing that "detailed judicial supervision of the election process would flout the Constitution's express commitment of the task to the States. *See* Art. I, §4").

Time and again, the Supreme Court has reminded us to afford appropriate deference to the policy decisions of a sovereign state in structuring its government, including how it seeks to administer elections. *See, e.g.*, *Crawford*, 553 U.S. at 181 (upholding an Indiana voter identification law); *N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196 (2008) (upholding New York's convention system for selecting a party's judicial nominees); *Clingman v. Beaver*, 544 U.S. 581 (2005) (upholding Oklahoma's semi-closed primary system); *Gregory v. Ashcroft*, 501 U.S. 452 (1991) (upholding age limits for state judges); *see also Rucho*, 139 S. Ct. at 2506–07 (holding that "partisan gerrymandering claims present political questions beyond the reach of the federal courts"); *accord* Brief of *Amicus Curiae* Brennan Center for Justice, at 24 (noting "Michigan's fundamental interest in ensuring free and fair elections for Michigan voters"). Generally speaking, our Court has fairly honored those state interests. *See Mays*, 951 F.3d at 787, 792 (upholding Ohio's absentee ballot regulations in the face of a constitutional challenge and noting "several justifications for Ohio's disparate treatment of confined electors" and "Ohio's interest in orderly election administration"); *George v. Hargett*, 879 F.3d 711, 730 (6th Cir. 2018) (upholding Tennessee law on vote-counting method partially because "any [] 'burden' was reasonably justified by the State's interest in ensuring that a proposed constitutional amendment enjoy widespread support as a prerequisite to adoption"); *Comm. to Impose Term Limits on the Ohio Supreme Ct. v. Ohio Ballot Bd.*, 885 F.3d 443, 448 (6th Cir. 2018) (upholding Ohio law requiring that a ballot initiative contain only a single proposed amendment in part because of "legitimate and strong state interests"); *Ohio Democratic Party*, 834 F.3d at 635 (upholding a law cutting the number of days for early voting opportunities in view of "Ohio's proffered interests of preventing voter fraud, increasing voter confidence by eliminating appearances of voter fraud, and easing administrative burdens on boards of elections," which are "undoubtedly important regulatory interests") (internal quotations omitted); *Ohio Council 8 Am. Fedn. of State*, 814 F.3d at 338 (upholding Ohio law precluding judicial candidates from listing their party affiliation on general-election ballots in light of Ohio's "important interest of reducing partisanship in judicial elections"); *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 578 (6th Cir. 2016) (recognizing "Kentucky's interests in avoiding voter confusion, ballot overcrowding,

and frivolous candidacies" in upholding a 2% automatic ballot-access law); *Estill v. Cool*, 320 F. App'x 309, 311–12 (6th Cir. 2008) (per curiam) (upholding Ohio ballot-access-restriction law as it furthered "Ohio's interest in ensuring qualified Sheriff candidates"); *Miller*, 144 F.3d at 925 (upholding legislative term limits for state legislators on the basis of Michigan's compelling interest "in structuring its government"). Whether the state practice relates to structuring its government through limits on state legislative terms or the use of a redistricting commission, or whether the state practice hews more closely to traditional election mechanics, such as verifying who is voting or setting the amount of time for doing so, we owe deference to the strong state interests at play, absent a clear constitutional command to the contrary. *See Crawford*, 553 U.S. at 191 (noting that three separate state interests justified the imposition of voter ID law's burdens); *Ohio Democratic Party*, 834 F.3d at 626, 632; *but see Ohio State Conf. of the NAACP v. Husted*, 769 F.3d 385 (6th Cir. 2014) (finding likely constitutional violation despite State's strong interest in establishing the terms of early voting), *vacated by Husted v. Ohio State Conf. of the NAACP*, 573 U.S. 988 (2014).

We heed that instruction again today. In upholding Michigan's decision to organize its system of government through the use of a bipartisan redistricting commission, we honor our nation's historical deference to a state's interest in self-government, something the Supreme Court has routinely emphasized in upholding the most analogous state laws to have come before it.

*Conflict-of-Interest Laws.* In *Nev. Comm'n on Ethics v. Carrigan*, the Supreme Court upheld a state conflict-of-interest law restricting a policymaker's participation in the governmental process. 564 U.S. 117 (2011). At issue in *Carrigan* was a Nevada law prohibiting legislators from voting on, or advocating for, issues in which they were thought to have a conflict of interest. *Id.* at 119. Critical to the Supreme Court's resolution was the understanding that "[a] universal and long-established tradition of prohibiting certain conduct creates a strong presumption that the prohibition is constitutional . . . ." *Id.* at 122. In upholding the law, the Supreme Court thus emphasized our nation's long history of conflict-of-interest regulations, both at the state and federal level, that preclude individuals from participating in the governmental process. *Id.* at 122–25 (noting that "[f]ederal conflict-of-interest rules . . . date back to the

founding" and that "[a] number of States, by common-law rule, have long required recusal of public officials with a conflict"). Contrary decisions cited by Carrigan, the Supreme Court explained, even if "relevant," would nonetheless "be too little and too late to contradict the long-recognized need for legislative recusal." *Id.* at 125; *see also Richardson v. Ramirez*, 418 U.S. 24, 48 (1974) (upholding a state law barring felons from voting based upon the fact that, at the time of the adoption of the Fourteenth Amendment, "29 States had provisions in their constitutions which prohibited, or authorized the legislature to prohibit, exercise of the franchise by persons convicted of felonies or infamous crimes").

As *Carrigan* demonstrates, historic foundational practices are a consistent benchmark for assessing whether a state action is constitutional. And in that respect, *Carrigan*'s lessons apply here twofold. One, conflict-of-interest regulations have a long historical pedigree, which bolsters their constitutionality. Michigan no doubt had those historical concepts in mind when it restricted from its line-drawing commission those whom the State believed were most likely to have biased or improper motivations. As those efforts accord with longstanding practices more generally, *Carrigan*, 564 U.S. at 122–25, I see no reason for a federal court to second guess Michigan's decision. *See Kraham v. Lippman*, 478 F.3d 502, 504 (2d Cir. 2007) (upholding a New York judicial rule that limited "high-ranking political party officials, their families, and the members, associates, counsel, and employees of their law firms from receiving New York State court fiduciary appointments").

Two, *Carrigan* more broadly reminds us of the respect we owe state decisionmaking. Few if any foundational practices are more cherished than the dual-sovereign system upon which our Republic was established. *Printz v. United States*, 521 U.S. 898, 918 (1997). In this system, "the States . . . retained a 'residuary and inviolable sovereignty.'" *Id.* at 918–19 (quoting The Federalist No. 39, at 245 (J. Madison)); *see also Oregon v. Mitchell*, 400 U.S. 112, 124 (1970) ("[T]he Constitution was also intended to preserve to the States the power that even the Colonies had to establish and maintain their own separate and independent governments . . . ."). That inviolable sovereignty affords states the opportunity to act as "laboratories of democracy," crafting rules and practices tailored to their unique political and cultural settings. *Garber v. Menendez*, 888 F.3d 839, 844 (6th Cir. 2018). When a state exercises its sovereign power

through its chosen structure and composition of government, we must respect that expression of sovereignty, unless "the Constitution itself demands otherwise." *Mitchell*, 400 U.S. at 124. And here, that is all Michigan desires to do: set regulations for its self-governance. With an eye to longstanding principles, we appropriately defer today to Michigan's preferred method of self-governance.

*Limitations on Officeholders and Public Employees.* History compels the same result as to a state's limitations on public employment, including those who hold public office. In *Clements v. Fashing*, 457 U.S. 957 (1982), the Supreme Court upheld, against First and Fourteenth Amendment challenges, a state law requiring Texas officeholders to complete their current terms of office (if the term overlaps with terms of legislators) before they may serve in the Texas Legislature. Like limitations on candidates to serve on a state redistricting commission, the existence of barriers to a candidate's access to the ballot "does not of itself compel close scrutiny." *Id.* at 963 (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)). Although the law at issue in *Clements* prohibited certain public officials from running for the Texas Legislature for two years, that prohibition was easily justified by the State's "interests in maintaining the integrity of" its current officeholders, "ensuring they will neither abuse [their] position[s] nor neglect [their] duties because of [their] aspirations for higher office." *Id.* at 968. That includes counteracting the temptation "to render decisions and take actions that might serve more to further [one's] political ambitions than the responsibilities of his office." *Id.* And it matters not that a State's regulatory regime addresses some issues, but not others. For Fourteenth Amendment purposes, "the Equal Protection Clause allows the State to regulate 'one step at a time, addressing itself to the phase of the problem which seems most acute.'" *Id.* at 969 (quoting *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 489 (1955)). A State thus "need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked." *Id.* at 969–70 (quoting *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 809 (1969)).

Like conflict-of-interest rules, limitations on who may serve in public office are as old as the Republic. At the founding, the Framers incorporated age requirements for holding federal office: 25 for the House of Representatives, 30 for the Senate, and 35 for the President.

U.S. CONST. art. I, § 2, cl 2, art. I, § 3, cl 3, art. II, § 1, cl 5.  The Framers placed citizenship and habitation requirements on service in the House and Senate, and a natural-born-citizenship requirement on who can be elected President.  *See id.*  Likewise, the Framers established unique measures for selecting members to the two houses of Congress:  one chosen by the voters, one by the state.  *Compare* U.S. CONST. art. I, § 2, cl 1 ("The House of Representatives shall be composed of Members chosen every second Year by the People of the several States . . . ."), *with* U.S. CONST. art. I, § 3, cl 1 ("The Senate of the United States shall be composed of two Senators from each State, chosen by the Legislature thereof . . . ."), *abrogated by* U.S. CONST. amend. XVII).  And the Framers also deemed it necessary to limit federal elected officials to one office at a time.  *See* U.S. CONST. art. I, § 6, cl 2 ("No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States . . . and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office.").

So too for limitations on a broader range of public servants.  The Supreme Court has repeatedly upheld limitations on the conduct of unelected public employees as well.  For instance, the Supreme Court upheld the Hatch Act's "restrictions on federal employees' political activities," and it did the same for "challenges to state statutes that impose similar restrictions on state employees."  *Molina-Crespo v. U.S. Merit Sys. Prot. Bd.*, 547 F.3d 651, 656 (6th Cir. 2008) (collecting cases).  In so doing, the Supreme Court rooted its reasoning in our nation's historical practice.  The Hatch Act's restrictions, it explained, "no more than confirm the judgment of history, a judgment made by this country over the last century that it is in the best interest of the country, indeed essential, that federal service should depend upon meritorious performance rather than political service . . . ."  *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 557 (1973).  To the same end, in applying the Hatch Act to a state employee whose agency received federal funds, we noted that "[t]he [Hatch] Act's prohibition on candidacy for elective office is rationally related to the government's interest because it allows the government to remove actual or apparent partisan influence from the administration of federal funds."  *Molina-Crespo*, 547 F.3d at 654, 658.

All of this is in accord with the longstanding history of and deference to the state interest at issue today—how a state selects its officeholders, in this case, its redistricting commissioners. The authority of a state's citizens to "determine the qualifications of their most important government officials . . . is an authority that lies at 'the heart of a representative government.'" *Ashcroft*, 501 U.S. at 463 (quoting *Bernal v. Fainter*, 467 U.S. 216, 221 (1984)). And it should go without saying that those state judgments are best made by the States, not unelected federal judges. *Accord Crawford*, 553 U.S. at 208 (Scalia, Thomas, & Alito, JJ., concurring) ("It is for [the] state . . . to weigh the costs and benefits of possible changes to their election codes . . . ."). The Fifth Circuit emphasized this very point in upholding a Louisiana prohibition on dual-office holding: "We do not doubt that the Louisiana Legislature could have drawn narrower definitional lines. As has often been pointed out, however, courts are ill equipped to judge the wisdom of such legislative line drawings." *Arceneaux v. Treen*, 671 F.2d 129, 134 (5th Cir. 1982) (citing *N.Y. City Transit Auth. v. Beazer*, 440 U.S. 568, 592–93 (1979)). States thus "deserve[] deference in structuring [their] government"—in fact, the Constitution demands it. *Miller*, 144 F.3d at 925 (citing U.S. CONST. amend. X). Out of respect for the sovereignty of states, we routinely defer to a state's preference for structuring its government, for instance, whether one is too old to serve in elected office, *Ashcroft*, 501 U.S. at 473 (finding a law restricting judicial office seekers to those under 70 to be constitutional), or how long one may serve in a state office. *Miller*, 144 F.3d at 924–25 (finding lifetime term limits constitutional and noting that we "should uphold a qualification 'unless the qualification is plainly prohibited by some other provision in the Constitution'" (quoting *Bates*, 131 F.3d at 859 (Rymer & O'Scannlain, JJ., concurring))).

That structuring aspect is at play here in two respects. At issue is how Michigan selects public officials to serve on a public body (the redistricting commission). And once selected, those commissioners will assist in crafting the legislative districts from which other public officials are chosen. That the Michigan electorate enacted the commission and its membership rules directly only strengthens the rationale for allowing these restrictions to stand. *See Ashcroft*, 501 U.S. at 471 (upholding a voter-adopted state constitutional provision; "[w]e will not overturn such a law unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the people's actions were irrational") (internal edits omitted). Michigan voters decided to prohibit

those they deemed to be "political insiders" from drawing legislative lines.  Whether one views that decision for the better or worse, it plainly is not "irrational."  *Id.*

That is why, setting aside my disagreement over *Anderson-Burdick*, it is refreshing to see the Court embrace as a central principle a state's prerogative in organizing its government, including its election system.  That principle is a paramount aspect of state sovereignty, and a cornerstone of federalism.

For these reasons, I concur in today's result.